# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SHERWIN-WILLIAMS COMPANY, f/k/a SHERWIN-WILLIAMS AUTOMOTIVE FINISHES CORP.,<br><br>Plaintiff/Counter-Defendant,<br>vs.<br><br>JB COLLISION SERVICES, INC., d/b/a J & M AUTOBODY, and d/b/a/ EL DORADO COLLISION; and DOES 1through 10, inclusive,<br><br>Defendant/Counter-Claimants. | CASE NOs. 13-CV-1946-LAB-WVG<br>13-CV-1947-LAB-WVG<br><br>**ORDER DENYING MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS** |
| THE SHERWIN-WILLIAMS COMPANY, f/k/a SHERWIN-WILLIAMS AUTOMOTIVE FINISHES CORP.,<br><br>Plaintiff/Counter-Defendant,<br>vs.<br><br>JJT, INC., d/b/a JOHN'S COLLISION CENTER, and JOHN TYCZKI, an individual, and DOES 1 through 10, inclusive<br><br>Defendant/Counter-Claimants. | |

Plaintiff Sherwin-Williams makes paints and coatings for cars. Defendants are two automotive body shops, JB Collision and JJT Inc., as well as their owner, John Tyczki. This action concerns two supply contracts between the parties: a September 2008 agreement

- 1 -

between Sherwin-Williams and JB, and a May 2011 agreement between Sherwin-Williams and JJT personally guaranteed by Defendant Tyczki. In the first contract, JB agreed to buy all of its paints, coatings, and related products from Sherwin-Williams until JB spent $1,300,000. In the second, JJT agreed to largely the same terms, except the supply term was $250,000. In return, Sherwin-Williams agreed sell its products to each Defendant at a discount and to provide each with a monetary advance ($275,000 and $40,000, respectively).

At a disputed time in early 2013, Defendants stopped buying all of their paints and coatings from Sherwin-Williams, and on February 28, 2013, Sherwin-Williams sent letters to both JB and JJT saying it believed each was in breach of its respective contract. Later, in April of 2013, JJT returned the $40,000 advance on its contract.

That led to this consolidated action. Sherwin-Williams filed a complaint asserting breach of contract claims against JB, JJT, and Tyczki, who counterclaimed contract and tort causes of action that in essence alleged Sherwin-Williams's products were no good. After Defendants amended their counterclaims once, the Court granted Sherwin-Williams's motion to dismiss them and gave Defendants partial leave to amend. (13-cv-01946, Docket no. 31.) On June 24, 2014, Defendants jointly filed second amended counterclaims ("SACC") asserting six causes of action: 1) breach of the JB contract; 2) breach of the JJT contract; 3) concealment/fraud; 4) intentional misrepresentation; 5) negligent misrepresentation; and 6) unjust enrichment. (Docket no. 36.)

Now before the Court is Sherwin-Williams's motion to dismiss all of Defendants' counterclaims save the two for breach of contract. According to Sherwin-Williams, the 27-page counterclaim complaint is time-barred, inadequately plead, contradictory, and non-cognizable under California law. Defendants oppose on all fronts.

I. **Legal Standard**

A Rule 12(b)(6) motion to dismiss for failure to state a claim challenges the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The Court must accept all factual allegations as true and construe them in the light most favorable to

Defendants. *See Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). To defeat Sherwin-Williams's motion to dismiss, the factual allegations of the SACC needn't be detailed, but they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, "some threshold of plausibility must be crossed at the outset" before a case can go forward. *Id.* at 558 (internal quotations omitted). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

While the Court must draw all reasonable inferences in a way that is favorable to Defendants, it need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotations omitted). In fact, the Court does not need to accept any legal conclusions as true. *Iqbal*, 556 U.S. at 678. A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotations omitted). Nor does it suffice if it contains a merely formulaic recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 555.

A pleading that sounds in fraud must satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). The complaint "must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). "To ascertain whether a complaint 'sounds in fraud,' we must normally determine, after a close examination of the language and structure of the complaint, whether the complaint 'allege[s] a unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a claim.'" *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) (quoting *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009)). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct

so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106. Thus, to survive a motion to dismiss, any claim sounding in fraud "must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

**II. Discussion**

When the Court granted Sherwin-Williams's previous motion to dismiss, it identified several pleading problems with Defendants' concealment/fraud and misrepresentation claims. The Court held that Defendants failed to connect allegations of concealment and fraud to any particular statements by Sherwin-Williams; that their factual allegations were based on the hard-to-accept premise that Defendants were defrauded into continuing the supply agreement despite being a dissatisfied customer of Sherwin-Williams for over two years; that the allegations were not careful to always specify who from Sherwin-Williams said what, and when and where it was said, with adequate particularity; that some of Defendants' general allegations constituted non-actionable puffery; that Defendants did not plausibly support the allegation that Sherwin-Williams knew it was misleading Defendants all along (as opposed to just having a good faith dispute over product quality); and finally that Defendants could overcome California's economic-loss rule (that no tort cause of action will lie where the breach of duty is nothing more than a violation of a contractual promise) *only* if it clarified that Sherwin-Williams's alleged misrepresentations about the quality of its products induced Defendants to enter into and, later on, to not terminate the supply agreements.[1] (Docket no. 31.)

**A. Factual Allegations**

Defendants' SACC goes a long way in directly addressing the Court's previous ruling. Defendants clarified that their asserted fraud claims were independent of their breach claim, premised instead on a theory that the contracts were fraudulently induced. (*E.g.*, SACC ¶¶ 17, 18, 20, 43-47, 54-55, and 62.) Defendants also alleged further factual detail, specifying

---

[1] The Court also determined that if this was indeed Defendants' fraud theory, it would be permitted to plead unjust enrichment in the alternative. (Docket no. 31 at 12.)

- 4 -

that, in August and September of 2008, Sherwin-Williams's agents Jose Garcia and Kurt Hammond told Tyczki that its water-based paint products provided "perfect color match," that they did not cause well-known paint problems such as "dye back,"[2] "sanding scratches,"[3] "color fading,"[4] "color match problems,"[5] "solvent popping,"[6] "paint shrinkage,"[7] and "orange peel."[8] (SACC ¶18.) Garcia is also alleged to have warranted that the products would allow Defendants to paint a vehicle "prime to shine in 50 minutes." (*Id.* ¶ 20(a).) Defendants further detailed that Garcia made the representations over the phone in August and September of 2008 knowing them to be false. (*Id.* ¶20(a)-(b).) According to the SACC, Sherwin-Williams represented that its water-based paint products were of the same quality as its solvent-based products to induce Defendants to switch, and whereas the solvent-based products had none of the above defects, Sherwin-Williams's water-based paints exhibited all of them. (*Id.* ¶19.)

Defendants allege that in September 2008, one week after being induced to switch to water-based paints, Tyczki noticed their color-match problems and complained to Garcia. (*Id.* ¶ 20(c).) According to the SACC, Garcia and Hammond then met with Tyczki at the Brigantine Restaurant in Poway, California to acknowledge that there were problems with the product and assure him that the problems would be corrected; the SACC goes on to

---

[2] According to the SACC, "Dye back is a defect in the paint in which the paint loses its shine and looks dull and flat," and is also known as "loss of gloss." (SACC ¶18.)

[3] "Sanding scratches are a defect where the marks from the body work performed prior to the application of the paint are exposed through the paint." (*Id.*)

[4] Color fading "is where the colors lose their brilliance, as if the color is being sucked out of the paint." (*Id.*)

[5] "Color match problems are where one batch, can, or mix of paint of a specific color[] does not match others of the same color." (*Id.*)

[6] "Solvent popping is where small, pinhole-like deformities appear on the outer layer (or clear coat) of the paint job." (*Id.*)

[7] "Shrinkage is where the primer sucks up the paint, causing a dry, matted finish, and also makes sanding scratches and other underlying impurities visible." (*Id.*)

[8] "[O]range peel is the development of a lumpy, yet still smooth, texture in the paint (rather than a flat surface) which causes the appearance of the paint to look like the outside of an orange peel." (*Id.*)

- 5 -

allege that Garcia and Hammond knew such representations to be false when making them, trying to induce Tyczki not to terminate the agreement. (*Id.* ¶20(d).) Sherwin-Williams represented that it would fix the water-based paints' color fading, sanding scratches, solvent popping, shrinkage, and dye back problems if the parties agreed to revert to solvent-based paints for six months, (*id.* ¶20(e)-(f)), and then represented that the problems were fixed approximately six months later, in March 2009, (*id.* ¶20(f)). Defendants allege that they acquiesced to using water-based paints once more, that the problems were not solved, and that Garcia and two other Sherwin-Williams representatives, Derrick King, and Hilary Castro, made repeated false promises that the ongoing problems would be corrected. (*Id.* ¶ 20(g).)

In all, Defendants allege that various Sherwin-Williams employees, named and unnamed, continually acknowledged the existence of defects, represented that they would have them cured, and failed to do so all the way through February of 2013. (*See id.* ¶¶20(a)-(l).) Defendants contend that they relied on all of such misrepresentations. (*Id.* ¶22.) Defendants' narrative also describes that, when the city of San Diego began to mandate the use of water-based paints in June 2010, Defendants continued to honor their agreement to purchase from Sherwin-Williams exclusively. (*Id.* ¶20(g).) Finally, the SACC describes that Defendants entered into the May 2011 supply agreement after opening the second location (under the new name John's Collision Center) based on Garcia's statement that Defendants remained contractually obligated under the unexpired 2008 contract's exclusivity provision. (*Id.* ¶20(h).)

### B. Defendants' Concealment/Fraud and Misrepresentation Claims

Under California law, intentional misrepresentation is a species of fraud, and "the elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Similarly, "[t]he essential elements of a count for negligent misrepresentation are the same except that it does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who

has no reasonable grounds for believing it to be true." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 231 (2013) (citing Cal. Civ. Code, § 1710, subd. 2). A complaint that adequately states a claim for intentional misrepresentation will therefore adequately state a claim for negligent misrepresentation. *See id.* Accordingly, the Court will consider these claims together.

The Court identifies two species of wrongs underlying Defendants' accusations that Sherwin-Williams fraudulently concealed or misrepresented information to them. The first involves Sherwin-Williams's statements about the quality of its water-based products. (*E.g.*, SACC ¶ 18 (alleging that Garcia and Hammond represented to Tyczki that Sherwin-Williams's "water-based paint products provided a perfect color match and did not have any defects that would cause problematic physical characteristics such as 'dye back' . . . , 'sanding scratches,' 'color fading,' color match problems, 'solvent popping,' paint 'shrinkage,' and 'orange peel.'"); SACC ¶ 45 (alleging fraud for "intentionally fail[ing] to disclose the poor quality and defects of Sherwin-Williams's paint and related products.")) The second category consists of promises to cure defects that would be ultimately unfulfilled. (*E.g.*, SACC ¶ 20(d) ("Mr. Hammond admitted to the prior misrepresentations and promised that the problems with the Sherwin-Williams water-based paint products would be corrected. . . ."); SACC ¶ 20(i) ("Mr. Sowell stated that 'I will take care of all of these issues' and that Sherwin-Williams would specifically correct the defects. . . .")); SACC ¶ 20(j) ("In or about October 2012, Derrick King (Sherwin-Williams) told John Tyczki that 'I am going to fix your problems,' that Sherwin-Williams would correct the paint products defects, and admitted that there were and had been continuing defects in the Sherwin-Williams products. . . .").) The first category concerns statements about the *current* quality of the products, whereas the second concerns statements about *future* actions to fix product defects. The difference is important because it takes the Court part of the way toward understanding why Defendants would continue purchasing Sherwin-Williams's products over the course of five years despite allegations of rampant defects. On the whole, Defendants' SACC alleges that they were initially strung along by representations in the former category, but then after Defendants

became all too aware of the defects, it took statements of the latter format to prevent them from breaking their exclusive supply contracts with Sherwin-Williams.

Defendants' allegations go on to capture the remaining elements of fraud: "As a direct and proximate result of Sherwin-Williams's deceit and concealment," Defendants allege, they were "induced to purchase, and continue purchasing, Sherwin-Williams's defective paint and related products." (SACC ¶ 47.) Defendants accuse Sherwin-Williams of making representations "with concurrent knowledge of their falsity," (SACC ¶ 20(k)), and acting with "intent to deceive," (SACC ¶ 45). They claim that they were deceived to both enter into the supply agreements *and* to refrain from terminating them. (FACC ¶ 44.) Defendants also assert claims for intentional and negligent misrepresentation on similar grounds. (SACC ¶¶ 49-56; 57-63.)

1. Statute of Limitations

If Defendants knew about the defects as early as 2008, as they allege, why did their fraud causes of action not accrue then? The California limitations period for fraud is three years; the cause of action accrues upon "the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Cal. Code Civ. Proc. § 338 (d). Plaintiff moves for dismissal on the grounds that Defendants have pled themselves out of any fraud claim by alleging that Defendants were first lied to in September of 2008. (Docket no. 40-1 at 13 (citing SACC ¶¶ 18-20).) Defendants offer three theories why their fraud claims are not time-barred: California's continuing violation doctrine, the theory of continuous accrual, and equitable estoppel.[9] (Docket no. 48 at 18-21.)

///

---

[9] Defendants' equitable estoppel theory is insufficient on its face, and the Court will only address it here. Equitable estoppel requires the party asserting it to "point to some fraudulent concealment, some active conduct by the defendant 'above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time.'" *Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1052 (9th Cir. 2008) (quoting *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006)); *see also Honig v. San Francisco Planning Dep't*, 127 Cal. App. 4th 520, 529, (2005). Because Defendants' alleged basis for equitable estoppel is identical to their basis for their underlying fraud claims – i.e., Plaintiff's misrepresentations – equitable estoppel will not toll their claim.

- 8 -

Under the continuing violation doctrine, "[a]llegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1198 (2013). The exception does not apply where the underlying acts would be "individually actionable." *Id.* at 1198; *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1058 (2005). Defendants urge the Court to apply this exception because Sherwin-Williams's continuing frauds prevented them from recognizing the extent of their injury and damages until after Sherwin-Williams stopped reimbursing Defendants for the defects. (*See* Docket no. 48 at 20.) But Defendants' argument shows precisely why this exception does not apply. If the only aspect of Sherwin-Williams's behavior that changed was that it ceased mitigating damages, then the substantive elements of Defendants' fraud claim (e.g. a misrepresentation, scienter, intent to defraud, reliance, and damage) by necessity would have already occurred. *See Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (2011) (holding that a claim generally accrues when it is "all of its elements" have occurred). This aspect of Defendants' fraud theory is confirmed by their SACC, alleging that all of the elements of a fraud claim occurred as early as September 2008 with Garcia's false assurances that the water-based paints lacked specific defects, which they indeed had, to induce Defendants into signing and not terminating the original contract. (SACC ¶ 18-20.) The continuing violation doctrine does not save Defendants' fraud claims.

Under California's theory of continuous accrual, "a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable limitations period." *Aryeh*, 55 Cal. 4th at 875-76. To determine when this exception applies, courts look "to the nature of the obligation allegedly breached." *Id.* at 1200. The key inquiry is whether the alleged violations of that duty were alleged to be recurring or not. *Hogar Dulce Hogar v. Comm. Dev. Comm'n*, 110 Cal. App. 4th 1288, 1295 (2003) ("When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act

- 9 -

occurs, triggering a new limitations period.") By its nature, the duty Sherwin-Williams owed—the duty not to make misleading representations—was a continuing one, susceptible to recurring breaches. The alleged acts of wrongdoing recurred from 2008 to as late as 2013. Accordingly, each alleged breach must be treated as triggering a new statute of limitations.

Defendants' fraud-based counterclaims relate back to their allegations of concealment, fraud, and misrepresentation in their original counterclaim filed October 1, 2013. Fed. R. Civ. P. 15(c)(1)(B). As a result, any claim accruing on or after October 1, 2010 will not be barred by the statute of limitations. But because Defendants' SACC describes acts of fraud and misrepresentations accruing after this date in addition to those accruing earlier, the Court cannot grant the motion to dismiss on this ground. (*E.g.*, SACC ¶¶ 20(h)-(l).)

2.  Sufficiency under the Applicable Pleading Standards

The parties agree that, because these claims sound in fraud, Defendants' pleading must satisfy Rule 9(b)'s particularity requirement. *Vess*, 317 F.3d at 1103-04. In addition, "claims of fraud or mistake . . . must, in addition to pleading with particularity, also plead plausible allegations." *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citing *Twombly*, 550 U.S. at 556).

Defendants' SACC is replete with factual allegations. The Court considers the following seven examples representative from the SACC:

> (i) "In or about June 2008 . . . Mr. Garcia specifically represented to John Tyczki that all products . . . not just paint would count toward the running of the JB Collision Term. . . . [But] Sherwin-Williams is now claiming that not all product purchases counted towards the $1.3 million JB Collision Term," (SACC ¶ 17);
> (ii) "[I]n or about August and September 2008 . . . Jose Garcia, and also Kurt Hammond, stated to John Tyczki that its water-based paint products provided a perfect color match and did not have any defects that would cause problematic physical characteristics such as 'dye back'. . . 'sanding scratches,' 'color fading,' color match problems, 'solvent popping,' paint 'shrinkage,' and 'orange peel,'" (SACC ¶ 18), "[representing] that its new water-based automotive paint . . . was of the same quality as the solvent-based paint," "however, unlike the solvent-based paint . . . Sherwin-Williams['s] water-based paint had all of the defects stated above." (SACC ¶ 19);

(iii) "[I]n or about August 2008 through early September 2008, over the telephone and at JB Collision's shops, in response to John Tyczki's specific questions concerning color match, dye back, and shrinkage, Mr. Garcia expressly stated to JB Collision, to John Tyczki, that Sherwin-Williams water-based automotive paint was already tested, proven, and perfected, was as good as Sherwin-Williams solvent-based paint products, and that that water-based products did not have color match problems, color fading, shrinkage, sanding scratches, solvent popping, and dye back. Mr. Garcia also stated that a vehicle could be painted 'prime to shine in 50 minutes' in response to John Tyczki's specific questions regarding the use of the products and JB Collision's volume of work; however, this was also not true." (SACC ¶ 20(a).)

(iv) "In or about March 2011 to May 2011 . . . Mr. Garcia promised that Sherwin-Williams was close to having the defects in their paint products resolved and thereby induced John Tyczki to enter into the JJT Agreement. Mr. Garcia continued to promise John Tyczki that Sherwin-Williams was working on a solution to fix the problems with its water-based paint system. . . . Garcia knew that Sherwin-Williams was not putting forth the effort, or did not have the ability, to correct the problems with Sherwin-Williams's water-based products, and was merely making these statements to induce Counter-Claimants to enter into the JJT Agreement and continue the exclusive relationship with Sherwin-Williams." (SACC ¶ 20(h).)

(v) "During 2012, David Sowell (Sherwin-Williams) and Jose Garcia met with John Tyczki at his office at John's Collision Center, and . . . Mr. Sowell stated that 'I will take care of all of these issues' . . . [but] , the defects in Sherwin-Williams paint products were not corrected." (SACC ¶ 20(i).)

(vi) "In or about October 2012, Derrick King (Sherwin-Williams) told John Tyczki that 'I am going to fix your problems,' (SACC ¶ 20(j).)

(vii) "On February 6, 2013 . . . Hilary Castro (Sherwin Williams) proposed a 30/60/90 day plan to purportedly correct the repeated problems . . . . However, it appears that Ms. Castro did not implement the plan." (SACC ¶ 20(l).)

Further, Defendants allege that in each of the above representations, "Sherwin-Williams's intended to induce and, in fact, did induce [Defendants] to enter into the Agreements and to not terminate the Agreements, Sherwin-Williams knew that its representations were false, and [Defendants] detrimentally relied upon those misrepresentations." (SACC ¶ 22.)

These allegations are pled with particularity, plainly identifying the who, what, when, how, and often even where of each statement. *See Vess*, 317 F.3d at 1106. In each instance, they identify the substance of the statement alleged to be a misrepresentation (the "what") – whether it be a representation that all purchases would count toward the total of Defendants' contractual obligations, that the water-based products lacked specified defects, that Sherwin-Williams was actively working on a solution to fix known defects, or promises that said defects would be fixed. *Who* made the statement (usually Garcia), and to whom

(usually Tyczki), is apparent on the face of each allegation. The SACC also identifies *when* each statement was made, often to the month and in one instance, to the specific day.[10] Sometimes, Defendants specify *where* the statement was made, such as over the phone or at a certain restaurant. Last, the allegation are careful to make explicit specifically *how* each statement was false: either because purchases would be accounted a certain way and were not, defects were solved when they persisted, Sherwin-Williams was working on a solution when they were not, or else it was promising to fix a problem when it had no intention of doing so.

Furthermore, the Court is not persuaded by Sherwin-Williams's argument that the reasonableness of Defendants' reliance is implausible in light of their other allegations, namely that they were systematically lied to for four years, but kept relying on Sherwin-Williams's representations anyway. This is not a fair characterization of Defendants' SACC. More accurately, Defendants claim that they were initially strung along by representations in that the products were free of defects, and then after seeing defects persist, relied on Sherwin-Williams's representations that it would fix the problems rather than risk Sherwin-Williams's wrath upon breaking the exclusive supply contracts. In any event, "'[w]hether reliance [on a misrepresentation] was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion.'" *Davis v. HSBC Bank*, 691 F.3d 1152, 1163 (9th Cir. 2012) (quoting *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 921 (2009)) (alteration in original). Sherwin-Williams has not shown Defendants' reliance was manifestly unreasonable. *Cf. id.* (reliance is manifestly unreasonable where the party asserting fraud "put[s] faith in representations that were preposterous or shown by facts within his

///

---

[10] The Court notes that some of the alleged acts of fraud are asserted to have been completed before the October 1, 2010 statute of limitations cut-off. Although these events cannot supply the required elements for Defendants' claims, that does not render them irrelevant. *See RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1062 (9th Cir. 2002) (citing AMTRAK v. Morgan, 122 S. Ct. 2061, 2072 (2002).) The Court further notes that at least four of the representative allegations examined, along with others in the SACC, are alleged to have occurred after October 1, 2010.

observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth").

Accordingly, the Court denies Sherwin-Williams's motion to dismiss under the Rule 8 and Rule 9(b) pleading standards.

### 3. Cognizability of Counterclaims

Sherwin-Williams identifies three possible reasons why Defendants' counterclaims do not present cognizable causes of action: the economic loss rule, the rule that mere puffery is not actionable, and the rule limiting misrepresentation claims based on unfulfilled promises of future performance. The Court addresses each in turn.

As in its previous motion to dismiss, Sherwin-Williams moves to dismiss Defendants' counterclaims under California's economic loss rule. (Docket no. 40-1 at 19-21.) This principle holds that "no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." *Oracle USA, Inc. v. XL Global Servs., Inc.*, 2009 WL 2084154 at *4 (N.D. Cal. July 13, 2009). "Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving into one another." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). As the Court identified in its prior ruling in this case, the economic loss rule does not bar tort claims for fraud or intentional misrepresentation if the allegedly tortious conduct is independent of the conduct constituting a breach. (*See* Docket no. 31 at 10 (citing *Robinson Helicopter*, 34 Cal. 4th at 989)). The Court also noted that one instance where the rule did not bar a tort claim was where the contract was alleged to be fraudulently induced. This is plainly what Defendants' SACC alleges, explicitly premising all of its fraud claims on an inducement theory. Accordingly, the Court finds that the SACC avoids the prohibitions of California's economic loss rule.

Sherwin-Williams also urges the Court to dismiss any counterclaims based on non-actionable puffery. "Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence are not actionable." *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005). By contrast,

"misdescriptions of specific or absolute characteristics of a product [generally] are actionable." *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990). Sherwin-Williams's motion takes issue with two phrases in the SACC that it believes constitute non-actionable puffery: "tested, proven, and perfected" and "perfect color match." The Court does not see anything vague or generalized about the concept of color match, which Defendants define clearly as "where one batch, can, or mix of paint of a specific color[] does not match others of the same color." (SACC ¶ 18.) Color match relates to "specific or absolute characteristics" of paint, namely their relative colors. *See Cook*, 911 F.2d at 246. Whether Sherwin-Williams's statements that its products were "tested, proven, and perfected" are actionable is a closer call, but the Court concludes that they are actionable as well. Certainly there is nothing generalized, vague, or unspecified about a statement that a product was tested or proven to lack certain defects. Whether the product has been "perfected" sounds vague at first, but in context becomes more definite. The SACC only mentions Sherwin-Williams's statements about having "perfected" their product in the context of the specific defects plaguing its water-based paints, namely dye back, sanding scratches, color fading, color match problems, solvent popping, paint shrinkage, and orange peel. (*See, e.g.*, SACC ¶ 18, 20(a)-(c), and 20(f).) In this context, "perfected" does not mean "perfect" so much as "solved," and Defendants' claims depend on the factual allegation that problems weren't solved – not that the products were less-than-perfect. Accordingly, the Court declines to dismiss any of the asserted claims as non-actionable puffery.

Last, Sherwin-Williams asks the Court to dismiss all claims based on unfulfilled promises of future performance. (Docket no. 40-1 at 22-23.) Under California law, an action for deceit based on a false promise requires a showing of specific intent; as a result, "[a] cause of action for a false promise should plead facts to show the existence of two specific intentions of the promisor: an intention to cause the promisee to act by reason of the promise, and an intention at the time of the promise not to keep it." *Hills Transp. Co. v. Southwest Forest Indus., Inc.*, 266 Cal. App. 2d 702, 708 (1968). While Sherwin-Williams

concedes that intent can be averred generally under Rule 9(b), it insists that Defendants must allege facts to show Sherwin-Williams's specific intent. Not only does the SACC allege Sherwin-Williams's intent and scienter generally, (SACC ¶ 22), but it also sets forth a pattern of allegations showing Sherwin-Williams continually making promises to cure whenever Defendants complained, while never managing to even marginally abate manifest defects in their water-based products over the course of five years. (SACC ¶¶ 20(d), 20(f), 20(h), and 20(k).) The Court concludes that the SACC, if true, provides a plausible account of Sherwin-Williams's specific intent.

### C. Unjust Enrichment

Defendants' final claim is for unjust enrichment. Ordinarily, "the doctrine of unjust enrichment cannot apply when an express contract exists." *Bickham v. Standley*, 917 N.E.2d 330 at 335 (Ohio Ct. App. 2009). This is because "[u]njust enrichment is an equitable doctrine, not based on contract law but upon quasi-contract." *Id.* But under Ohio law, which governs the parties' contract disputes, "[a] claim for unjust enrichment may be pled in the alternative when the existence of an express contract is in dispute and may be maintained despite the existence of an express contract where there is evidence of fraud, bad faith, or illegality." *Cheers Sports Bar & Grill v. DirecTV, Inc.*, 563 F. Supp. 2d 812, 819 (N.D. Ohio 2008). The Court has interpreted *Cheers* to stand for the proposition that, wether or not the existence of an express contract is up for debate, an unjust enrichment claim may be pled in the alternative where there are also allegations of fraud. (*See* Docket no. 31.) *See also* Fed. R. Civ. P. 8(a)(3) (stating that a pleading "may include relief in the alternative or different types of relief"). Last, Defendants acknowledge that their unjust enrichment claim is pled in the alternative to its contract claims. As a result, the Court does not see a reason to dismiss their unjust enrichment claim at this stage.

### III. Conclusion

The Court denies Sherwin-Williams's motion to dismiss Defendants' fraud-based tort claims and unjust enrichment claim. Sherwin-Williams's grounds for dismissal were similar to what it pushed in its previous motion to dismiss, but Defendants added significant factual

detail to its SACC. To the extent that any claim accrued before October 1, 2010, it is barred by the statute of limitations.

**IT IS SO ORDERED**.

DATED: October 9, 2014

*[signature]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge