1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

THE SHERWIN-WILLIAMS
COMPANY,

                          Plaintiff,

          vs.

JB COLLISION SERVICES, INC. et al.,

                          Defendants.

CASE NO. 13cv1946-LAB (WVG)

**ORDER ON SHERWIN-WILLIAMS'
MOTION FOR JUDGMENT AS A
MATTER OF LAW OR
ALTERNATIVELY A REMITTITUR OF
DAMAGES/NEW TRIAL.  (DOCKET
NO. 285)**

        Sherwin-Williams has filed a post-trial motion for judgment as a matter of law or alternatively a remittitur of damages/new trial.  (Docket no. 285.)

**I.      Factual Background**

        This lawsuit arises out of a pair of automotive paint product supply agreements. Sherwin-Williams entered into the agreements with two auto body shops—JB Collision Services (the "JB Supply Agreement") and JJT (the "JJT Supply Agreement"). Sherwin-Williams sued the auto body shops and their owner, John Tyczki (collectively "the Body Shop Defendants"), for breach of contract, alleging they prematurely terminated the agreements.  (Docket no. 1.)  The Body Shop Defendants contend that Sherwin-Williams' products were defective, and asserted counterclaims for breach of the Supply Agreements, concealment/fraud, intentional misrepresentation, negligent misrepresentation, and unjust enrichment.  (Docket no. 36.)

**A.    JB Supply Agreement**

The first communication between the parties occurred in June 2008 when one of Sherwin-Williams' sales representatives approached Tyczki about a potential exclusive automotive paint products supply contract.  Tyczki became interested in Sherwin-Williams' new water-based paint line, AWX.  In September 2008, JB and Sherwin-Williams entered into the JB Supply Agreement.

Under the JB Supply Agreement, JB was to purchase all of its requirements for "Products" from Sherwin-Williams until the gross sales of its purchases of "SW Paint Products" reached $1.3 million.  "SW Paint Products" was defined as "automotive paints and coatings manufactured and sold by Sherwin-Williams under the 'Sherwin-Williams label.'" "Products" was defined as: "all automotive paints, coatings and related products, including, without limitation, the following: (i) primers; (ii) top coats; (iii) hardeners; (iv) abrasives, tapes, adhesives; and (v) all other associated products."  In consideration for exclusivity, Sherwin-Williams gave JB a discount on certain products and a $275,000 advanced payment.  The JB Supply Agreement provided that upon the occurrence of an "Acceleration Event," such as early termination, JB was required to refund a pro rata amount of the advance payment.

**B.    JJT Supply Agreement**

In May 2011, JJT and Sherwin-Williams entered into the JJT Supply Agreement, which was similar to the JB Supply Agreement.  The contract was to last until gross sales of SW Paint Products to JJT reached $250,000. Sherwin-Williams made a $40,000 advance payment to JJT, and the entire amount was to be refunded in the case of an Acceleration Event. Tyczki signed a personal guaranty for consideration of the advance payment to JJT.

**C.    Allegations in the Body Shop Defendants' Counterclaim**

The Body Shop Defendants' counterclaims were based on the contention that Sherwin-Williams falsely promised to fix their products' problems.  They argued that Sherwin-Williams induced them to enter into the JB Supply Agreement by falsely representing that its water-based paint was high quality.  (Docket no. 36 at ¶ 20.)  Then

1  when quality issues arose, Sherwin-Williams allegedly admitted that the paint had quality
2  problems, but nonetheless induced the Body Shop Defendants to enter into the JJT Supply
3  Agreement and refrain from terminating the Supply Agreements by falsely promising that it
4  was working on a solution to fix the problems.  (*Id*.)

5  Specifically, the Body Shop Defendants' Second Amended Counterclaim alleged that
6  from August 2008 through September 2008, Sherwin-Williams represented that its
7  water-based paint was high quality; had been "tested, proven, and perfected"; and could be
8  painted "prime to shine in 50 minutes." (*Id*. at ¶ 20.a.)  The Body Shop Defendants alleged
9  that these representations turned out to be false, that they experienced problems within a
10  week of using the water-based paint, and when confronted about the issues,
11  Sherwin-Williams admitted that its paint products had quality problems. (*Id*. at ¶ 20.c.)  The
12  Body Shop Defendants alleged further that, starting in September 2008, Sherwin-Williams
13  promised that the problems with the water-based paint would be corrected, but they weren't.
14  (*Id*. at ¶¶ 20.d–f.)  The Body Shop Defendants contended that Sherwin-Williams knew these
15  promises were false, but made them to induce them to refrain from terminating the JB
16  Supply Agreement.  (*Id*.)  They alleged that in 2011, when Tyczki was forming JJT,
17  Sherwin-Williams repeated the same false promises to induce the Body Shop Defendants
18  to enter into the JJT Supply Agreement.   (*Id*. at ¶ 20.h.)   They contended that
19  Sherwin-Williams continued to make these false promises through February 2013 to induce
20  them to refrain from terminating the two Supply Agreements.  (*Id*. at ¶ 20.k.)

21  **D.    The Body Shop Defendants' Allegations at Trial**

22  The Body Shop Defendants' allegations shifted by the time of trial.  While their
23  counterclaims alleged that Sherwin-Williams *acknowledged* that its paint had quality
24  problems, at trial they also alleged that Sherwin-Williams *denied* the quality problems.  The
25  Body Shop Defendants claimed that Sherwin-Williams blamed their painters for the issues
26  and falsely told them that they were the only ones having problems.  Indeed, the "only ones"
27  and "blame the painters" allegations seem to contradict their initial allegation that, within a
28  week of entering into the JB Supply Agreement in September 2008, Sherwin-Williams

1
2
3
4

admitted that [its] water-based paint products did have problems, admitted that the problems were "company-wide" and not due to JB Collision's workmanship, and that, contrary to [one of Sherwin-Williams' representatives'] prior representations that Sherwin-Williams's water-based products had been perfected, the problems existed before JB Collision and Sherwin-Williams entered into the JB Collision Agreement.

5
6

(*Id*. at ¶ 20.c; *see also id*. at ¶¶ 20.h–j (alleging Sherwin-Williams made similar admissions in 2011 and 2012).)

7
8
9
10
11
12

Additionally, in opening statement, Sherwin-Williams suggested that the Body Shop Defendants were frustrated not because of bad paint, but because they thought Sherwin-Williams would give them an $80,000 advance for the JJT Supply Agreement, but ultimately only agreed to provide a $40,000 advance. (Docket no. 275 at 22–23.) The Body Shop Defendants added the new claim that this "$80,000/$40,000 switch" was also fraud by Sherwin-Williams. (Docket no. 280 at 221–22.)

13
14
15
16
17
18
19
20

The Body Shop Defendants' counsel's closing argument went even further and leveled several unpleaded fraud allegations. He argued that Sherwin-Williams' warranty disclaimer constituted "fraud, trickery, and plain old dishonesty," even though this claim was never pled. (*Id*. at 218.) He made the unpled argument that Tyczki's guaranty was "fraud" and "trickery" because he signed it three weeks before he received the JJT Supply Agreement, so he didn't know what it bound him to. (*Id*. at 220.) He also made the unpled argument that it was fraud that Sherwin-Williams' damages under the JJT Supply Agreement weren't limited to a return of the advance. (*Id*. at 222–23.)

21

**E.    The Body Shop Defendants' Damages Evidence**

22
23
24
25
26
27
28

Tyzcki testified that, during the approximately five year time that the Body Shop Defendants used Sherwin-Williams' products, they painted 10,000 vehicles with AWX. (Docket no. 279 at 185; *see also* Docket no. 36 at ¶ 27.) He estimated that it would cost him an average of $2,000 to repair a vehicle. (*Id*.; *see also* Docket no. 279 at 185.) At trial he revised his estimate upwards to $3,200 per vehicle. (*Id*. at 157–58.) He testified that he had submitted a total of 37 warranty claims to Sherwin-Williams, only three of which had been paid. (*Id*. at 153.) The Body Shop Defendants submitted evidence that their unpaid

warranty claims amounted to $106,357.07.  (*Id.* at 157; Docket no. 280 at 240; Docket no. 285-2.)  Tyzcki testified further that approximately 60 or 65 other people were waiting to have their vehicles repaired.  (Docket no. 279 at 157.)  And there was testimony that the Body Shop Defendants had repainted around 100 or more vehicles due to paint defects.  (Docket no. 278 at 57.)

The Body Shop Defendants asked the jury for $20 million and then $32 million in compensatory damages.  (Docket no. 279 at 186; Docket no. 280 at 53–54.)  They calculated this demand by multiplying first $2,000, then $3,200, by the total number of vehicles they had painted with AWX from 2008 until 2013.  (Docket no. 279 at 186; Docket no. 280 at 53–54.)  They acknowledged, however, that they didn't know whether the 10,000 vehicles would actually need to be repainted.  For example, Tyzcki admitted "Now, is all those cars out there?  I don't know.  But I do know I have to make phone calls."  (Docket no. 280 at 53–54.)  The Body Shop Defendants' counsel's closing argument expressed a similar sentiment.  He argued:

> I want to talk to you about damages very briefly.  John Tyczki painted 12,000 cars, there's true, but ten -- about 10,000 was painted with the AWX system. Every car that he had seen that's come back had dyeback, every car, and he's been fixing them; he's fixed them, he's got people on the waiting list, and he knows there are more coming.  Just like these guys all testified that they have; every car that they keep -- get back that they've painted with AWX has dyed back.  It's just -- not just limited to John Tyczki.
>
> *So are we asking that all 10,000 cars be compensated for* and -- whether it be by partial -- partial on the breach of contract, the warranty, the fraud claim, the unjust enrichment?  *No, no, we're not, because we don't know, we can't tell how many cars are still on the road, but we – but we can use our common sense and say that perhaps half of them are still out there.* And the cost of repairing the cars, as you heard initially, was $2,000 a car, but that was two and a half years ago about, and as you saw from the final bills under warranty, that cost has gone up to $3,200 a car.  And you can do the math. If you go with half the number of cars and you times it by what needs to be fixed, the 1300, it comes to 16 million.  *And if you say well, you know, I don't think it's that many -- you know, don't base it on my experience, you're the jury -- and it's not that many or it's more, then you can do that math. . . .*

(Docket no. 280 at 239–40 (emphasis added).)

Tyzcki and other witnesses' testimony also suggested the possibility that the Body Shop Defendants suffered reputation damage based on defective paint jobs.  (Docket no.

277 at 53 (a customer refused to bring a vehicle back), 55 (AWX "put a bad name for [the Body Shop Defendants'] business"), 57, 58, 138–39 (a witness testified that he was embarrassed by a paint job on his truck), 146–48 (Jaguar owner testified that his car looked "pretty sad" four weeks after a paint job, so he stopped bringing it to events); Docket no. 278 at 132 (testimony that there was dye back on repeat customers' vehicles), 151 (Tyzcki testifying that customer service is important to him).)

At trial, Sherwin-Williams challenged the Body Shop Defendants' damages evidence in a Fed. R. Civ. P. 50(a) motion for a judgment as a matter of law.  (Docket no. 280 at 64–65.)

### F.    The Body Shop Defendants' Counsel's Closing Argument

Besides the unpled fraud arguments, Sherwin-Williams' motion takes issue with much of the Body Shop Defendants' counsel's closing argument.  Among other things,  the Body Shop Defendants' counsel compared Sherwin-Williams' conduct with respect to its paint to the Ford Motor Company Pinto case, where Ford was alleged to have conducted a cost-benefit analysis in determining whether deaths associated with the Pinto's fuel system warranted the cost of repairs.  (Docket no. 280 at 203); *Grimshaw v. Ford Motor. Co.*, 119 Cal.App.3d 757 (1981).  He falsely argued that Sherwin-Williams had prevented the jury from viewing a Toyota Sequoia painted with Sherwin-Williams' paint, even though the Body Shop Defendants never put the Sequoia on their trial exhibit list or tried to arrange a jury viewing of it.  (*Id*. at 266.)  He offered a false explanation for why his expert failed to timely test Sherwin-Williams' paint system.  (Docket no. 124 (detailing the Body Shop Defendants' dilatory conduct in discovery and prior inconsistent excuses for failing to timely test Sherwin-Williams' paint); Docket no. 280 at 238 (claiming that Sherwin-Williams' destruction of toners—not the Body Shop Defendants' failure to realize they needed wet paint samples and a shipping mishap as they had previously argued—was the reason for their failure to test); Docket no. 137 at 6 (admitting they didn't even know they'd need wet samples until three days before their expert report was then due); *id.* at 7 (admitting that they didn't know the wet samples they had were inadequate until January 14, 2016—two days before their

report was due under the amended scheduling order); Docket no. 197 at 6–7 (admitting it takes four weeks to test wet paint samples); *id.* at 7 (the Body Shop Defendants were able to obtain paint from an alternative source and test it, showing that they could have done so within the discovery period if they had acted with diligence).) He also continually pointed out that Sherwin-Williams was an Ohio company, when the only apparent reason to do so was to pit the California-based jury against an out of town company. (Docket no. 280 at 217–19; 241.) Sherwin-Williams objected to some of these arguments, but not all of them.

> **G.  Verdict**

The jury's general verdict found for Sherwin-Williams on its breach of contract claims, against the Body Shop Defendants on their breach of contract and unjust enrichment claims, and for them on their fraud/concealment, intentional misrepresentation, and negligent misrepresentation claims. (Docket no. 266.) It awarded Sherwin-Williams $374,448.70. (*Id.*) It awarded the Body Shop Defendants $750,000 in damages for fraud/concealment, $1,250,000 in damages for intentional misrepresentation, and $1,250,000 in damages for negligent misrepresentation. (*Id.*)

## II.  Legal Standards

> **A.  Fed. R. Civ. P. 50(b)**

"Rule 50 requires a party seeking judgment as a matter of law to file a Rule 50(a) motion at any time before the case is submitted to the jury. If the jury later returns a verdict against the moving party, this party may then file a Rule 50(b) motion for judgment as a matter of law." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1081 (9th Cir. 2009). In considering a motion for judgment as a matter of law "the court should review all of the evidence in the record"; in doing so "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). "A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014). "A motion for judgment as a matter

of law should be granted only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1036 (9th Cir. 2003), *as amended on denial of reh'g and reh'g en banc* (June 17, 2003).

Rule 50 permits the Court to reduce the jury's damages award to the maximum amount supported by the evidence in the record. *Integra Lifesciences I, Ltd. v. Merck KGaA*,2004 WL 2284001, at *12 (S.D. Cal. Sept. 7, 2004). The law applied in evaluating the legality of the amount of a jury verdict is substantive. *Gasperini v. Center for the Humanities*, 518 U.S. 415, 425, 428–31 (1996). Thus, under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), a federal trial court sitting in diversity applies state law in determining whether a jury's award of damages is proper. The Court determines whether the jury's fraud verdict is within the confines set by California law. *Gasperini*, 518 U.S. at 437; (Docket no. 173 at 6 n.1.) A court doesn't need to offer the option of a new trial when damages are reduced pursuant to a judgment as a matter of law. *Integra Lifesciences I, Ltd.*, 2004 WL 2284001, at *12; *see also Central Office Telephone, Inc. v. American Telephone & Telegraph Co.*, 108 F.3d 981, 993 (9th Cir.1997) (reversed on other grounds).

## B.    Fed. R. Civ. P. 59

Fed. R. Civ. P. 59 authorizes the Court to "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." The Court may grant a new trial if the jury's verdict is against the clear weight of the evidence. *Landes Constr. Co. v. Royal Bank of Can*., 833 F.2d 1365, 1372 (9th Cir. 1987). "[T]he burden of showing harmful error rests on the party seeking the new trial." *Malhiot v. S. Cal. Retail Clerks Union*, 735 F.2d 1133 (9th Cir. 1984). "Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict." *Seymour v. Summa Vista Cinema, Inc*., 809 F.2d 1385, 1387 (9th Cir. 1987). "A remittitur must reflect the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (internal quotation marks omitted).

III.    **Discussion**

     A.    **Was the Verdict Inconsistent?**

The jury found that Sherwin-Williams caused over one million dollars in harm to the Body Shop Defendants by failing to disclose facts and making negligent and intentional misrepresentations.  (Docket no. 267 at 34–36.)  But it also found that Sherwin-Williams "substantially performed its duties under the [Supply Agreements]."  (Docket no. 267 at 14.)  And it rejected the Body Shop Defendants' arguments that Sherwin-Williams made their performance impracticable by failing "to provide quality paint products" or otherwise "prevented them from performing their obligations under the [Supply Agreements]."  (*Id*. at 24, 32.)

The Court finds it difficult, but not impossible, to thread the needle through the jury's seemingly inconsistent general verdict.  The jury could have concluded that the AWX product wasn't defective to the point that it made the Body Shop Defendants' performance impracticable, but also that it had some flaws.  *Cf. Murphy v. Sheftel*, 121 Cal. App. 533, 540, 9 P.2d 568, 571 (Cal. Ct. App. 1932) ("[W]here the defect is not such a failure to perform as renders the performance of the rest of the contract a thing different in substance from what was contracted for, and the loss occasioned is capable of compensation in damages, there is a substantial performance."); *Missouri Pub. Serv. Co. v. Peabody Coal Co.*, 583 S.W.2d 721, 727 (Mo. Ct. App. 1979) (impracticable does not mean impossible). And it could have found that, but for Sherwin-Williams' concealment and misrepresentations, JJT and Tyczki wouldn't have entered into the JJT Supply Agreement and instead would have used a paint product that didn't require them to redo as many vehicles.  It also could have concluded that, but for Sherwin-Williams' concealment and misrepresentations, the Body Shop Defendants would have breached the Supply Agreements sooner and used a better product.  *See Huynh v. Vu*, 111 Cal. App. 4th 1183, 1199 (2003) (explaining "efficient breach theory," where it's worth more to the promisor to breach than to perform contract). The verdict therefore can be reconciled.  *Cf. Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003) (inconsistency in general jury verdict doesn't require new trial).

**B.    Whether There Was Sufficient Evidence to Establish The Fraud Claims**

Sherwin-Williams correctly argues that the Body Shop Defendants' counterclaim only mentions one basis for their fraud claim—that Sherwin-Williams continued to promise that it was working on a solution to fix their problems.  (Docket no. 36 at ¶ 20; Docket no. 285 at 3–7.)  And with respect to this basis, it argues that the Body Shop Defendants never introduced any evidence of falsity—i.e. evidence that Sherwin-Williams wasn't working on a solution.  (Docket no. 285 at 7–8.)

**1.    Amendment of Pleadings to Conform to the Evidence**

The Body Shop Defendants argue that they should be allowed to amend their counterclaim to assert their "only ones" and "$80,000/$40,000 switch" allegations pursuant to Fed. R. Civ. P. 15(b)(2).  (Docket no. 297 at 18 n.1.)

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2).  This rule applies to added causes of action as well as added theories of liability arising under an already-pleaded cause of action.  Wright & Miller, Fed. Prac. & Proc. § 1493 n.27; *see also Consol. Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 395 (9th Cir. 1983).  "[L]ate pleading amendments are improper under the rule if they cause substantial prejudice to the opposing party."  *Id*. at 396.

Since the Body Shop Defendants neither amended their counterclaim by motion nor received express consent from Sherwin-Williams to try their unpleaded fraud theories, they must show trial by implied consent.  *Id*.  To establish implied consent, the Body Shop Defendants must demonstrate that Sherwin-Williams understood that their "$80,000/$40,000 switch" and "only ones" evidence had been introduced to prove fraud, *see Campbell v. Trustees of Leland Stanford Jr. Univ.*, 817 F.2d 499, 506 (9th Cir. 1987), and that fraud had been directly addressed, not merely inferentially raised by incidental evidence, *Consolidated Data Terminals*, 708 F.2d at 396.

/ / /

The "only ones" allegation arose, at the very latest, in Tyczki's September 2014 deposition. (Docket no 143-10 at 277, 445, 482–83.) And it was prominently argued as an example of Sherwin-Williams' alleged wrongdoing in the Body Shop Defendants' April 2015 opposition to Sherwin-Williams' motion for summary judgment. (Docket no. 143 at 7–9, 24, 25.) The "$80,000/$40,000 switch" argument was raised in the same filing (Docket no. 143 at 5; Docket no. 143-1 at ¶¶ 6, 7), and Sherwin-Williams' opening argument demonstrated that it was well aware of the issue, (Docket no. 275 at 22.) Thus, Sherwin-Williams had sufficient opportunity to conduct discovery on the issues and to prepare for them in advance of the November 2015 trial. There was no prejudice to Sherwin-Williams in allowing the Body Shop Defendants to amend their pleading to include the "only ones" and "$80,000/$40,000 switch" arguments.

> **2.      Whether the Body Shop Defendants Presented Sufficient Evidence to Prove that the Alleged "Fix Your Problems" Promise was False**

Sherwin-Williams contends that the Body Shop Defendants offered no evidence to support the falsity of the alleged "fix your problems" promise. (Docket no. 285 at 7.) It argues that

> even if evidence was offered by Defendants that Sherwin-Williams actually told Defendants that it was working on a solution or "fix" to the alleged defects in its paint, Defendants never offered evidence that this representation was in fact not true. At most, Defendants provided evidence that Sherwin-Williams said it was trying to fix its paint and Defendants relied on those statements to continue purchasing paint products as required by contract. Defendants did not prove that Sherwin-Williams was not trying to fix its paint.

(*Id*.) Sherwin-Williams maintains that, if anything, the evidence shows that it was working to improve AWX. (*Id*. at n.4 (citing Docket no. 279 at 224–52 (testimony from the Body Shop Defendants' expert that Sherwin-Williams' internal documents revealed that it knew that AWX had quality problems, and was working to fix them)).)

When asked at his deposition about the alleged falsity of Sherwin-Williams' alleged "fix your problems" promise, Tyczki explained that he thought it was false because Sherwin-Williams never came back to tell him how it would fix his problems. (Docket no. 143-10 at 424, 450.) The Body Shop Defendants introduced the same evidence at trial.

1  (Docket no. 279 at 287–88 (Tyczki's testimony that in 2008 a representative for
2  Sherwin-Williams told him that he would fix the Body Shop Defendants' problems); Docket
3  no. 279 at 291 (Tyczki's testimony that in 2012 a vice president for Sherwin-Williams
4  promised he'd fix the problems and would get back to him within two weeks, but did neither);
5  *id*. at 292 (Tyczki's testimony that other representatives for Sherwin-Williams told him they
6  would fix the problems, but never did).)  Taken in the light most favorable to the Body Shop
7  Defendants, this evidence could establish circumstantial evidence of falsity.  *People v.*
8  *Phillips*, 186 Cal. App. 2d 231, 240 (Ct. App. 1960) (falsity can be proved through
9  circumstantial evidence).  A jury could infer from Sherwin-Williams' alleged repeated
10  promises to fix the Body Shop Defendants' problems, and continued failure to do so, that
11  Sherwin-Williams either didn't intend to fix the problems, or knew it wouldn't be able to fix
12  them, but made the promises anyway.

13  **C.   Whether the Fraud Claims Fail Under the Economic Loss Rule**

14  The economic loss rule "is that no tort cause of action will lie where the breach of duty
15  is nothing more than a violation of a promise which undermines the expectations of the
16  parties to an agreement." *Oracle USA, Inc. v. XL Global Servs., Inc*., 2009 WL 2084154 at
17  \*4 (N.D. Cal. July 13, 2009).  The economic loss rule prevents the law of contract and the
18  law of tort from dissolving into one another. *Robinson Helicopter Co. v. Dana Corp*., 34
19  Cal.4th 979, 988 (2004).  It "requires a purchaser to recover in contract for purely economic
20  loss due to disappointed expectations, unless he can demonstrate harm above and beyond
21  a broken contractual promise." *Id*.  The Court previously explained that the economic loss
22  rule doesn't bar a tort claim where alleged fraudulent misrepresentations induce the
23  asserting party to either enter into the agreement or to not terminate it.  (Docket no. 31 at 10;
24  Docket no. 56 at 13.)
25  / / /
26  / / /
27  / / /
28  / / /

The Body Shop Defendants alleged they were induced to:

    (1)    Enter the JB Supply Agreement;

    (2)    Enter the JJT Supply Agreement;

    (3)    Not terminate the JB Supply Agreement;

    (4)    Not terminate the JJT Supply Agreement.

(Docket no. 36 at ¶ 20.k.)

The Court previously held that any fraud claims based on alleged inducement to enter the JB Supply Agreement are time barred.  (Docket no. 173 at 10–11.)  So inducement number 1 couldn't be a basis for the Body Shop Defendants' fraud claims; the jury was instructed accordingly.  (Docket no. 267 at 42.)

As Sherwin-Williams points out, the Court questioned whether JJT and Tyczki could be induced to enter into the JJT Supply Agreement in light of their knowledge of the alleged paint defects.  (Docket no. 280 at 73–74.)  But the Court eventually determined that Sherwin-Williams' alleged "only ones" representations and promises to fix the Body Shop Defendants' alleged problems could support a verdict for fraud in the inducement of the JJT Supply Agreement.  (*Id*. at 121–23.)

In accordance with the Court's previous ruling, inducements 3 and 4 were also viable.  (Docket no. 31 at 10; Docket no. 56 at 13); *see also Robinson Helicopter*, 34 Cal. 4th at 990–91, 994 (2004) (fraud claim based on deficient contract performance and reliance on contractually required certificates, which falsely verified that performance wasn't deficient, not barred by the economic loss rule); *cf. Regus Mgmt. Grp., LLC, v. Int'l Bus. Mach. Corp*., 2008 WL 1836360, at *7 (N.D. Tex. Apr. 24, 2008) (claim for fraudulent inducement to continue performance of contract not barred by the economic loss rule).  Sherwin-Williams makes much of Tyczki's trial testimony that he wouldn't have terminated the JB Supply Agreement if he knew he hadn't satisfied the $1.3 million term.  (Docket no. 279 at 328.)  Based on this, Sherwin-Williams contends that the trial evidence negates the Body Shop Defendants' inducement argument with respect to inducement number 3.  But Tyczki's testimony about whether he would have terminated the JB Supply Agreement came after his

1    testimony that he didn't know Sherwin-Williams had lied to him until after it had brought this
2    lawsuit.  (Docket no. 279 at 311.)  So the jury could have interpreted his testimony to refer
3    to his state of mind at the time that he was still under the JB Supply Agreement, which was
4    before the lawsuit and before he knew about Sherwin-Williams' alleged lies.

5           The economic loss rule doesn't provide a basis for judgment as a matter of law.

6           **D.     Whether there was Sufficient Evidence of Fraud Damages**

7           Sherwin-Williams argues that the jury instructions don't allow the Body Shop
8    Defendants to recover for prospective damages.  (Docket no. 300 at 4.)  It also argues that
9    the Body Shop Defendants' damages evidence was speculative.  (Docket no. 285 at 9–14.)
10   Sherwin-Williams points out that the Body Shop Defendants don't know if all 10,000 vehicles
11   they painted with AWX from 2008 to 2013 need to be repaired, and presented no evidence
12   to answer the question.  (*Id.*)  They only multiplied 10,000 vehicles first by $2,000 per
13   vehicle, and then revised their estimate upwards to $3,200 per vehicle.    (*Id.*)
14   Sherwin-Williams notes that the jury's verdict suggests that either 1,052 or 1,625 cars will
15   need to be repainted, depending on the cost per vehicle the jury accepted.  But there's no
16   evidence to support either number.

17                    **1.     Whether Prospective Damages Are Available**

18          Sherwin-Williams' argument that prospective damages aren't available is based on
19   the use of the word "spent" in the fraud damages jury instruction.  It essentially contends that
20   if future damages were available, the jury instruction would clarify that "amounts . . .
21   reasonably spent in reliance" includes amounts already spent and amounts that will be spent
22   in the future.  (Docket no. 267 at 43–44.)  This argument is overly technical.  The relevant
23   instruction is taken from CACI 1924, which in turn is based on Cal. Civ. Code §§ 1709 and
24   3333. Both of those sections allow recovery for prospective damages. *See Boeken v. Philip*
25   *Morris USA, Inc*., 48 Cal. 4th 788, 799 (2010).  The Body Shop Defendants can recover for
26   prospective damages.
27   / / /
28   / / /

### 2.      Whether There's Sufficient Evidence of Damages

An award of damages may include an amount to compensate for related expenses that are "certain to result in the future."  Cal. Civ.Code § 3283.  "However, the requirement of certainty cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award."  *Behr v. Redmond*, 193 Cal. App. 4th 517, 533 (2011), *as modified* (Mar. 25, 2011) (internal ellipses and quotation marks omitted).  "Still, there must be evidence to show such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury."  *Id.* (internal quotation marks omitted).  And "where the uncertainty is too great, recovery will be denied."  6 Witkin, Summary 10th (2005) Torts, § 1552, p. 1026.

To recover damages based on an obligation owed to a third party, "more certainty is necessary than just evidence of an obligation to pay a third party."  *Green Wood Indus. Co. v. Forceman Int'l Dev. Grp., Inc.*, 156 Cal. App. 4th 766, 778 (2007).  The claimant "must demonstrate that it will suffer the damage with reasonable certainty—that is, [it] must prove to a reasonable certainty that [it] could and would pay the liability."  *Id.*  In *Green Wood*, a buyer was fraudulently induced to pay for scrap metal that never existed.  *Id*. at 770.  It prevailed in its lawsuit against the seller and a facilitator of the fraud, and was awarded damages.  *Id*. at 770–71.  Included in the damages award was $274,868, which compensated for the plaintiff's liability for non-delivery of the scrap metal to a China-based resale buyer.  *Id*. at 771.  The trial evidence established that the resale buyer had made a $274,868 claim based on the non-delivery, and the plaintiff had agreed to pay it.  *Id*. at 778.  Still, the award was reduced by $274,868 on appeal because the plaintiff hadn't proved to a reasonable certainty that it would pay the claim against it.  *Id.*  The court explained that, "[a]lthough there is evidence that Green Wood had, in effect, settled the claim by agreeing to pay it, Green Wood presented no evidence that any such agreement would be enforceable in China, or that the liability could and would be enforced by the buyer in the United States or elsewhere, or that the claim will otherwise be paid."  *Id.*; *see also U.S. ex rel. Belt Con Const., Inc. v. Metric Const. Co.*, 314 F. App'x 151, 156 (10th Cir. 2009)

(despite liability to third party, no reasonable certainty of damages because no evidence that third party would enforce warranties).

In light of *Green Wood*, it's not clear that the Body Shop Defendants' evidence establishes the fact of prospective damages to a reasonable certainty. If damages aren't reasonably certain where the plaintiff has agreed to pay a claim that has been made against it, it's dubious whether they're reasonably certain where there's been no claim or promise to pay, and the claimant's damages are based on a stated intent to resolve third party claims as they arise.

Even if the Body Shop Defendants' evidence did establish the fact of damages, there's still no evidence in the record to establish the amount of their damages based on an unknown number of possible future repairs. *Noble v. Tweedy*, 90 Cal. App. 2d 738, 746, 203 P.2d 778 (1949) (requiring "a satisfactory method for obtaining a reasonably proximate estimation of the damages."). The Body Shop Defendants didn't introduce any evidence that would allow the jury to determine what portion of the vehicles that they had painted in the past would need to be repainted. For example, they offered no evidence that would allow the jury to determine how many of the vehicles are still on the road. Nor did they offer evidence regarding the number that had been resold to new owners or repainted for reasons other than paint quality. And they offered no evidence on the normal life span of a vehicle's paint job. Since the Body Shop Defendants sought reimbursement for vehicles painted more than seven years before the trial, their failure to account for these considerations is significant. The Body Shop Defendants asked the jury to rely on their "common sense" to make up for their lack of evidence. But it's difficult to understand how the jury's common sense could supply the missing information. The Body Shop Defendants' counsel's argument that the jury could divide the number of vehicles in half or more wasn't an invitation for the jurors to use their common sense; it was an invitation for them to engage in guesswork. The jury was forced to rely on pure speculation to arrive at their damages calculation.

/ / /

1    The same is true with respect to damages for reputational harm.  Tyczki testified that
2    he took his reputation seriously.  And there was testimony that suggested the possibility that
3    the Body Shop Defendants may have lost some work due to quality issues.  But they offered
4    no evidence that would allow the jury to calculate the amount of resulting damages.

5    Taken in the light most favorable to the Body Shop Defendants, the evidence
6    establishes that flaws in Sherwin-Williams' product caused them $106,357.07 in damages
7    for unpaid warranty claims, required them to redo 100 vehicles, and that there's another 65
8    vehicles waiting in the queue to be repaired.  Using the Body Shop Defendants' higher
9    estimate of $3,200 to repair a vehicle, the evidence supports a maximum verdict of
10   $634,357.07 on their fraud claims.  The damage award is reduced to that amount pursuant
11   to Fed. R. Civ. P. 50(b).

12   **E.    Whether the Verdict was a Product of Passion, Prejudice, or Misconduct**
13   Finally, Sherwin-Williams seeks a new trial based on the Body Shop Defendants'
14   counsel's trial conduct.  To receive a new trial because of attorney misconduct in the civil
15   context, defendants must meet a high standard: "the moving party must demonstrate
16   adverse counsel's misconduct . . . 'substantially interfered' with the moving party's interest."
17   *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995).  "To warrant reversal
18   on grounds of attorney misconduct, the flavor of misconduct must sufficiently permeate an
19   entire proceeding to provide conviction that the jury was influenced by passion and prejudice
20   in reaching its verdict."  *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286
21   (9th Cir. 1984) (internal quotation marks omitted).  Where, as here, "offending remarks
22   occurred principally during . . . closing argument, rather than throughout the course of the
23   trial," courts are less inclined to find the statements pervaded the trial and thus prejudiced
24   the jury.  *Id*.

25   The Court agrees that the Body Shop Defendants' counsel frequently meandered into
26   highly improper topics during his closing argument.  However, the Court instructed the jury
27   several times that the statements of lawyers are not evidence.  (Docket no. 280 at 135–37,
28   245–46, 267.)  Indeed, on at least two occasions, the Court did this in direct response to

counsel's improper conduct. (*Id*. at 245–46, 267.) And the Court gave a curative instruction in response to the Pinto argument, telling the jury to ignore it. (*Id*. at 245–46.) The Court finds that the improper comments made in closing arguments were corrected. They therefore didn't permeate the entire proceeding, and don't warrant a new trial.

## IV.    Conclusion

The Court **GRANTS IN PART AND DENIES IN PART** Sherwin-Williams' motion for a judgment as a matter of law. The Court **DENIES** Sherwin-Williams' motion for a remittitur of damages/new trial as moot. The damage award on the Body Shop Defendants' claims is reduced to $634,357.07, resulting in a net verdict of $259,908.37 in their favor.

**IT IS SO ORDERED**.

DATED: May 9, 2016

**HONORABLE LARRY ALAN BURNS**
United States District Judge